*Birchard, J.
These suits were brought to effect a set *386 tlement of the boundaries of two parcels of land, embracing the site of Sandusky City, being a part of the township of Portland, or of the gore lying between the township of Perkins and the •southern shore of. Sandusky Bay. The great value of the property in controversy, and the importance of the issue to the numerous parties interested in it, have elicited untiring industry on the part of their respective counsel in preparing these causes for •a final hearing, and demand at our hands a careful investigation.
This land is a portion of the half million of acres granted in 1792 by the State of Connecticut to those of her citizens who suffered by the burning of Danbury, and several other towns, by the public enemy, during the revolutionary war. In the year 1803, these grantees and sufferers were incorporated by an act of the ■legislature of this state, which act authorized the appointment ■of a board of directors for the purpose of locating and surveying the grant, and making partition thereof among the numerous ■proprietors. In pursuance of their duty under this act, the directors, through Sherman, their agent, on December 16, 1805, entered into a contract with James Clarke, Jr., and John McLane to survey the entire grant. Before this survey could be made, it became necessary to settle a preliminary question with a company, who, under the name of the Connecticut Land Company, in the year 1795, purchased the remainder of the Connecticut Western Reserve, including prior grants, and particularly the grant of the half-million acres to the sufferers. This latter grant was bounded north on Lake Erie, but it was finally agreed by the agents of both the companies that the waters of the bay should be ■considered the waters of the lake, and that the northern boundary ■should be run by competent surveyors under the superintendence ■of two agents, one appointed on behalf of each company. Mc-Lano and Clarke began a traverse under the direction of Sherman and Spafford, the agents of their respective companies. The .answers of the respondents to the original bill, alleges that they did “so far settle all necessary lines *to enable the two companies to run and establish the dividing lines between the land owned by the respective companies,” and that McLane and Clarke did traverse the south shore of Lake Erie and Sandusky Bay “so .as to enable the two companies to run the division line, and run it correctly;” (and this traverse was the one adopted by the diirectors, and which regulated and controlled the' whole survey, and *387 •all the annexations on Sandusky Bay,) “ and that this traverse is ■as binding upon the proprietors of the annexations as any other line.” There exists a train of circumstances and facts which induce the belief, and carry to our minds the conviction, that these allegations of the answer, however honestly made, are not in truth agreeable to fact.
1. If true, the area of the entire grant, instead of being given ag 500,027 acres, would have been some 8,000 acres greater than that number.
2. The gore in dispute would have had an area of 4,500 acres, nearly, instead of 2,783 acres.
3. The plats executed at the time, instead of representing the •shore of the bay, where it bound this fraction on the north, as -corresponding nearly with a right line drawn between the northern extremities of the side lines, would have corresponded more nearly with the true shore of the bay. Add to these the acts of the directors and the statements of witnesses, and all doubt is removed .as to the object and uses made of this traverse. It was never acted upon for any purpose beyond the effecting a settlement with the Connecticut Land Company. It could never have been regarded as a true line for the purposes of partition. Clarke and McLane left their work incomplete. In consequence of this, and of supposed inaccuracies, the directors, by Isaac Mills, their agent, on March 14, 1808, entered into a contract with A. Ruggles to survey and subdivide the entire grant, “ and especially the fraction )r broken tracts or parcels of land on the shore of the lake, that they might be annexed together,” and to furnish a map, showing all the town-lines, streams, or water-courses, together with a traverse of the shores of Lake Erie *and Sandusky Bay. Under this contract Ruggles mado a survey, and on November 7, 1808, returned to the directors his field notes and map, upon which is stated the area of each township and fraction, and also the field notes of the traverse of the shores of the lake and bay, taken by McLane and Clarke, certifying that his own work was correct, and stating that he could not certify that the traverse of McLane and Clarke was correct.
This survey was approved, and several hundred copies of the map by Ruggles were ordered to be published. In making the partition among the sufferers, the directors seem to have acted entirely upon this survey and report. A map struck under the *388 order of tho directors, and a copy of tho manuscript map. used by them in making the partition, are in evidence, and upon neither of them is there anything to indicate tint the McLane and Clarke traverse was at all regarded. On the contrar>-, they show that it must have been entirely disregarded by Ruggles in platting the survey, and by the directors in aparting the lands.
Exhibit number two, appended to the answer of Mills, shows the plan of making the partition adopted by the directors. It is an important document, and mutually relied upon by all tho-parties to this proceeding. It is a record of the proceedings of the directors at a meeting holden at the county-house in New Haven, Connecticut, on November 8, 1808, to which Was reported-at length the plan of partition which was finally adopted. This report recites, among other things, that Ruggles had completed a survey of the lands of the company, by surveying it into five ranges of townships from south to north. The report gives the locality, boundaries, and area of each range, township, and fraction. It recites “ that the twenty-third range contains six square townships of the same dimensions as the others ” (five miles from north to south, and a little more than five miles from east to west), “with a traction between the north line of the sixth township and tho shore of tho Sandusky Bay, containing 2,783 acres,” and, after recommending tho mode of numbering, etc., it further recites, “that*range twenty-third consists of six townships, numbered as aforesaid, exclusive of the fraction of 2,783 acres, between-township number six and tho Bay of Sandusky, which is afterward annexed to section four, in township number one, in the-twenty third range, and sections one and four, in township number one, in the twenty-fourth range;” and stating that the object of making annexation is to render each section of equal value, in order that the whole land might bo aparted and divided by the drawing of one hundred and twenty classifications; tho proprietors-in each classification drawing the equivalent of one quarter township or section. The report recommends “ that to section first, in township number one, in the twenty-fourth range, be annexed 1,783. acres olf the east end of the fraction of 2,783 acres, betwoeu the north end of township number six, in the twenty-third range, and Sandusky Bay. That to section four, in township number one, in the twenty -fourth range, bo annexed 500 acres of said fraction, of 2,783 acres between the north end of township number six, in> *389 the twenty-third range and Sandusky Bay, next west of the former annexation of 1,783 acres; and that the remaining 500 acres ■of said fraction of 2,783 acres be annexed to section four, in township number one, in the twenty-third range.” This exhibit ■further shows that, on November 9,1808, “the directors proceeded to and completed the draft, and made the exact partition of all the lands of the company, agreeably to the foregoing mode of parti* tion and act of incorporation,” and voted that the field minutes of the survey of the “lands of the company, made by Almon Buggies, Esq., in pursuance of his contract with the company, be approved and recorded at full length in the records of the company.” The present controversy has arisen from the fact that the fraction •lying between township six and the shore of the bay, including the marsh or lands frequently or constantly covered by the waters of the bay, has an area of about 4,500 acres instead of 2,783 acres. The respondents to the original bill, in their answer, and by their cross-bill, claim that the proprietors of the eastern annexation shall have their demand satisfied by a survey *of 1,783 acres, and no more, to be taken from the east part of the fraction, making the Clarke and McLane traverse, or the shore of the bay, their northern, and the township line of Perkins their southern boundary; and that five hundred acres next west, shall in like manner, be surveyed to satisfy the second annexation, leaving, for the purpose of satisfying the third annexation (which, in the words oí the directors, is “ the remaining 500 acres of the fraction of 2,783 acres ”), over 2,200 acres, no part of which is land covered with water. In support of this bold proposition, the court are urged to construe the descriptive language of the records of proceedings of the company, as we would similar language of description in a deed of bargain and sale; to apply the technical rules which govern such cases, and thereby gather the intention of the directors, regardless of all the other evidence manifesting their real intention, and, especially, regardless of all the parol and ■other proof, showing that such a course will clearly defeat the •object of the directors, will give to the owners of the third annexation an unjust advantage which was never intended, and will throw upon the owners of the 1,783 acre tract near 600 acres of marsh, swamp, or bay, which the directors and their agent, in the controversy with the Connecticut Land Company, were unwilling to receive and measure as land. We concede and recognize the *390 doctrino that the boundaries of the fraction and annexations, as-fixed by tho directors, when found, are to remain immovable, and that the partition made is, in fact, the conveyance of their proportions to the respective owners. Nor is it d,oubted that when land' is conveyed by m.etes and bounds, all the land within the bound, and no more, passes by the deed or grant. It is upon this principio that we hold that all the land between the north line of Perkins- and Sandusky Bay was disposed of by the three annexations, notwithstanding the fact that tho directors assumed only to dispose, of 2,783 acres, when, in fact, they disposed of 4,500 acres.
Taking the record evidence by itself, it sufficiently appears’ that tho true area of the fraction was unknown to any of the *parties engaged in making the partition.
Ruggles did not pretend to have measured any but the base and side lines. Ho reported that McLane and Clarke’s traverse could not bo relied upon, in bis final report and previous letters. The-face of his maps shows that he did not follow it in platting. The-area stated could not have been given if any calculation had been based upon it, and could only have been found, as uniformly stated in the record, to contain 2,783 a'eres, by closing tho survey with an imaginary right lino, drawn between the northern termini of tho side lines. Other proof shows that the directors,, agent, and surveyor were aware that the extension of the east line fifty-three chains, would carry that part of the boundary off the dry land, and some twenty-eight chains into the marsh or bay, where the water was frequently from three to four feet in depth, and would include many superficial acres of what was not regarded as land, in the adjustment of boundaries between the Sufferers’ grant and the Connecticut Land Company. They were-also aware that the shores of the bay wore very irregular, and that, as claimed by them in the settlement with tho other company, the water-line would, in some places, lie south, and, in others, north of the right line assumed in estimating the quantity. The estimate, as shown by the letters ol Ruggles and the statements of the directors, was intended to be kept, at least, within the actual quantity of dry land, excluding the marsh and water; and, in making .the north and south parallel linos, to divide tho annexations, it was undoubtedly designed to intersect the base line at points where they would cut it, establishing them upon mathe. matical principles, assuming the measurement to be as reported *391 by Ruggles : The base, four hundred and twelve chains in length ; the east line at right angles, and fifty-three chains in length ; the west line also at right angles, and eighty-two chains in length;, and the survey closed by a right line. This would give two hundred and eighty-three chains seventy links, for the base of the 1,783 acre tract; sixty-six chains and eighty-hundredths for the base of the first 500 acres next west therefrom, and a base "of sixty-one chains and a half for the “remaining 500 acres;” *and, in the words of the records of the directors, “ make a complete and exact partition of all tho lands of the company, according to the foregoing mode of partition.”
The whole of the land between the shore of the bay and the north line of township six was so divided, because that is what was intended to be done. Were it a fact that 'the whole record, taken together, owing to the manner and form of the expressions employed, would not admit of a construction consisteut with tho object had in view by the directors, the merits of this cause would make it a legitimate subject for the interposition of a court of chancery to correct the mistake, and to prevent annexation thus from acquiring an advantage inequitable, unlair, and unjust, in any and every aspect in which it may be viewed. But a court of equity is not at.liberty, nor is a court of law at liberty, to gather the intention of tho directors from an isolated part of the record. The whole, when brought forward and relied upon, should be looked to and considered as one act and deed. Tho object in view, and the means of arriving at it — equality of division and a complete partition, without a remaining surplus — were the great objects. Having no traverse of the bay, they gave quanüty as a rule of proportion, according to their understanding of the rights of proprietors; and what boundaries they intended can now, and could then, be lound only by adopting their mode of ascertaining the quantity given as their rule of proportion. Why should the descriptive words of the first 'and second annexations be the exclusive guide, and all other parts of the record disregarded? Wh3r disregard the plats referred to in the proceedings, and used at the time? Why overlook the objects in view — the duty of directors to make a complete and equitable division? Why the fact that, in equalizing, the values of the annexations are given in the quantity of acres each was supposed to contain? And why the words used descriptive of the third annexation — ‘‘.the remaining 500 acres of *392 the fraction of 2,783 acres ” — words that clearly imply, that all of the fraction, save the 500 acres, was, in fact, given to the first two annexations? Independently of all parol proof, it is impossible for us to suppose *the directors meant to leave an undivided portion of the fraction ; as imposille to believe they intended to give to the third annexation 2,200 acres of the better portion of the’ tract. Taking the acts done, the facts and things to which their words referred, as they existed when the words were employed, and the true meaning may be safely gathered from a consideration of the whole, and in no other way.
They had three measured lines; an unmeasured,-but natural boundary, for the fourth line, and an underestimated quantity, all laid down upon a plat — the whole to be divided in the proportion agreed on. Thoy'so divided as to exhaust the entire base. Had this base been severed by lines run upon the ground, the descriptive words would not have changed those lines. They were only marked upon the plat. Yet the intention in this, as in all other grants, should govern; that intention was, that each annexation should appropriate a portion of the base, in proportion to the quantity, and the contents of the entire tract.
Eldredge, one of the directors, testifies that the area of the fraction was ascertained as we have supposed. Mills and Wildman have both said the same thing. Eldredge also states, that “it was the intention of the directors, that the 1,783 acres, from the east side of the gore, should extend west, on the south line of the gore, its duo distance, allowing the other tracts, of 500 acres each, the same extent of base, according to the quantity, and the supposed jhape of the gore.” The imaginary lino was used merely as the means of making the division, but it was intended that each annexation should extend to the bay shore. All the facts connected with the case so strongly fortify this statement that it would seem an unbiased mind could not question its accuracy. We believe in it, and act upon it. It will give to each tract more than the quantity estimated by the directors and Buggies, and will bound each, on all sides, by the boundaries intended, and will not enrich one class of proprietors at the expense of another.
Several objections to establishing the boundaries, as originally designed, romain to be considered. First in order is the *suit determined in this court, in 1827, in Lockwood v. Mills, 3 Ohio, 21. That was a bill in chancery claiming that there was a *393 parcel of surplus, or undivided lands, lying west of the throe annexations, to which all, who drew any interest in the fraction, were tenants in common. It alleged a state of facts which never existed ; and, proceeding upon false premises in matters of fact and conclusions of law, was rightly dismissed, because, had there been a surplus, there was no such tenancy in common as was alleged, and all the parties interested by the showing of the bill and answers were not made parties. This was all that was necessary to bo decided to settle that suit, and all that should be considered as settled by it. In the opinion reported, the court remark that “the annexation, by acres, shows that so many acres were deemed sufficient to equalize the allotments made to each; and we conceive that the actual contents of the lraction can neither diminish nor enlarge the quantity annexed in this case, because the claim of each to his separate annexation was distinct from, and independent of, the other. If there had been a deficiency, each party entitled to an annexation must have been satisfied in the order of his claim, and the one who, in point of law, was last, must have been thrown upon the company, or bear the loss.”
The quotation is doubtless better law when applied to the ease which elicited it, than when applied to one essentially different. Tt should be borne in mind that the court were not called upon to. ■establish an unascertained boundary, and did not undertake to determine that the first annexation should not have the identical boundaries intended by the directors. The opinion is based upon the hypothetical case, there presented as a real one, and merely adoptR the well-established rule, that where a tract is granted, bounded upon three sides by natural or artificial limits, and the ■quantity given as the means of ascertaining the fourth line, the cxac-t quantity, and no more, passes by the grant. A iormor decree to be a bar, even when well pleaded, or set up by way of answer, must be such as shows that the rights of complainants, now set up, have boon already conclusively determined. 7 Johns. Cli. 1. *llenee, in support of a plea of former decree, it is necessary to set forth so much of the first bill and answer as will show the same point was then in issue. Collins v. Gough, 7 Bro. P. C. 94; 2 Mad. 314. But wo can not treat that adjudication as a bar, without doing what the parties do not require of us.
Mills, in his answer, prays that the court would ascertain and *394 establish the west line of said 1,783 acre annexation, and the west line of said 500 acre annexation, next west therefrom, in exact accordance with- the modo of partition adopted by the directors of said' Sufferers’ Land Company, and that the court would then cause to be divided and aparted to each of the owners and proprietors, in each of said annexations, his and their just and exact proportions of said annexation according to the modo of partition, adopted by said board of directors. The answers of the Wikimans refer to the answers of Mills, make it a part of their own, and pray for a like partition; and the eross-bills contain a similar prayer in substance.
The next objection is the statute of limitations, and the above-quotation, from the answers, removes this obstacle. No advantage-can be taken of the statute unless it is pleaded, or insisted upon, by the answer. 1 Atk. 493. Yet, if the answers and eross-bills were differently framed, the statute is not a bar. The actual adverse possession of Mills and Wildman, began about 1818, the time-when the city was surveyed into lots — certainly not prior to 1816— for white settlements did not extend west of the camp,-at Huron, during the war. Before this E. Lockwood died, and his three-sons had never been in this state prior to tho filing of their bill.
John Cannon, the sufferer, died in 1796; John, his son, in 1797,. leaving John the 3d, who has never been in the State of Ohio, and who joined in filing the present bill. John the 2d also loft E. M. Townsend, Sarah St. John, and George Cannon ; the former of whom has always resided out of the state, and who is a party to-the present proceedings. Sarah died in 1808, leaving George B. St.John her heir, neither of whom have, ever been in the state.. •George, the son of John 2d, died in 1829, also being a non-resident. His children are parties to *the original bill. Esther St. John, the present claimant, was the daughter of James Cannon, .the sufferer, who died in 1798. Esther lias always been “beyond seas.” Kneeland Townsend purchased of Mills, in 1824, and between that time and the commencement of this suit, the statute has-not had time to run.
The fact that the parties had knowledge of the adverse possession more than twenty-one years before suit, and bad agents-within the state, does not, as we think, remove the disability and take the case from within tho proviso of the act. That the proviso is in force was settled in 7 Ohio, 152, 225.
*395 The remaining objection is lapse of time. Courts of equity protect parties against stale demands, and will not encourage them in sleeping upon their rights, but will, in general, follow the analogies of the statute. These claimants are not, however, barred, if we adopt the analogies of the statute. Although more than twenty-one years elapsed after their property was wrongfully taken into the exclusive possession of Mills and Wildman, be'ore thoj7 filed this bill, it is not readily preeeived that the claim is a stale one. In some form or other it has been in litigation nearly the whole of the time since 1818. The proceedings in partition sought to be confirmed in one aspect of the case, were begun as-early as 1827, and are now ponding on a writ of error to the eour. of common picas. If the parties have slept upon their rights, ought it to be brought up in judgment to condemn them, cóntrarj to equity, when, from all the lacts, it appears that for twenty-four years they have made continuous efforts to rouse themselves enough to make the merits of their claim manifest in a court of justice, maugcr the skillful, and, hitherto, successful management of their more experienced and bettor informed adversaries? They have-not slept. They merely acted inefficiently, as opposed to more skillful men. Decree must be entered for complainants, referring-the cause to a master to make partition, valuation of property sold to bona fide purchasers, etc., reserving other questions until the coming in of the report. Decree accordingly.
Lane, C. J., did not sit in this case.